UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
ELIZABETH M. VAUGHN,                      )
                    Plaintiff,             )
                                           )
    v.                                     )
                                           )        No. 05-11534-JLT
INVESTORS MARKETING SERVICES, INC.,        )
INVESTORS CAPITAL HOLDINGS, LTD.,          )
INVESTORS CAPITAL CORPORATION,             )
JANICE CHARLES and THEODORE CHARLES,       )
                    Defendants.            )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANTS INVESTORS MARKETING SERVICES, INC. AND JANICE CHARLES' MOTION TO DISMISS THE COMPLAINT

Plaintiff Elizabeth Vaughn hereby submits this Opposition to Defendants Investors

Marketing Services, Inc. and Janice Charles' (collectively "IMS") Motion To Dismiss Ms.

Vaughn's Family and Medical Leave Act ("FMLA") claims pursuant to Fed.R.Civ.P. 12(b)(6)

for failure to state a claim, and Rule 12(b)(1) for lack of subject matter jurisdiction.[1] IMS raises

the following two arguments: (1) Ms Vaughn is not an eligible employee under the terms of the

FMLA because her direct employer, IMS, has fewer than the 50 employees required under the

FMLA and because IMS is not an "integrated employer" with Investors Capital Corporation

("ICC") and Investors Capital Holdings, Ltd ("ICH"); and (2) Ms. Vaughn has failed to state a

claim under the FMLA because she did not adequately allege a "serious health condition" and

did not allege notice of her requested leave to the employer.  As discussed in detail below, each

of these arguments is without merit.

---

[1]     The other defendants answered the Complaint on October 7, 2005.

## I.    Factual Background[2]

### A.    Ms. Vaughn's Request For FMLA Leave

Ms. Vaughn began her employment with IMS on or about July 5, 1995. (Complaint, ¶ 11)

Ms. Vaughn was an exempt, full-time employee, working at least 40 hours per week. (Id. ¶ 13)

She worked at least 1250 hours in the last 12 months prior to her requested medical leave. (Id.)

She did not take any unpaid leaves of absence during the last 12 months prior to her termination.

(Id.)

During the spring of this year, Ms. Vaughn informed her supervisor Jennifer Lanouette

that she needed to have a partial hysterectomy. (Id. ¶ 16) The surgery would require an inpatient

procedure, including an overnight hospital stay, and six to eight weeks of recovery. (Id.) During

the recovery period, Ms. Vaughn would not be able to, among other things, lift items or drive.

(Id.) Ms. Vaughn requested a leave of absence for the surgery and the 6 to 8 week recovery

period recommended by her doctor. (Id.)

In April, Ms. Vaughn confirmed her need for the surgery and notified Ms. Lanouette that

the surgery would take place on August 9, 2005. (Id. ¶ 17) Ms. Lanouette told her not to worry

about her leave of absence. (Id.)

On June 6, 2005, Ms. Vaughn was terminated from her employment. (Id. ¶ 18)

### B.    IMS, ICC and ICH Are Integrated Employers

IMS, ICC and ICH are all in related businesses.[3] IMS is in the business of providing

fixed annuity, life insurance and long term care products. (Id. ¶ 3) ICH is a financial services

---

[2]    The factual background is based upon Ms. Vaughn's Complaint, attached hereto as Exhibit 1. In the event the Court deems IMS' Motion to be brought pursuant to Fed.R.Civ.P 12(b)(1), Ms. Vaughn has verified the facts in her Affidavit, attached hereto as Exhibit 2.

[3]    The following facts relevant to the FMLA claims are undisputed: (1) IMS has fewer than 25 employees (Id. ¶ 25); (2) if IMS, ICC and ICH employees are combined, the number of employees exceeds the FMLA threshold of 50 employees (Id.); (3) IMS, ICC and ICH are within 75 miles of each other (Id.); and (4) ICC and ICH are located at the same location. (Id. ¶¶ 4-5)

holding company that operates primarily through its subsidiaries in two segments of the financial

services industry: (i) securities, mutual funds, variable annuities and variable life insurance and

(ii) financial planning services. (Id. ¶ 4)  ICC, an ICH subsidiary, makes available multiple

investment products such as variable annuities and provides support, technology and back office

services to its network of 800 independent registered representatives.  (Id. ¶ 5)  In addition to

running similar business, ICC generates revenue for both ICH and IMS.  For example, ICC sales

account for 95% of the revenue of ICH.  (Id.)  Similarly, if an ICC agent sells a fixed insurance

product under IMS, IMS receives a percentage of the commission. (Id.)

The overlap does not end there. The interrelationship between IMS, ICC and ICH is best

stated in the ICH 2004 Annual Report, filed with the Securities and Exchange Commission:

> Investors Marketing Services, Inc. is jointly owned by [ICH]'s principal
> stockholder, Theodore E. Charles and his spouse, Janice M. Charles.  This entity
> performs a fulfillment function for subsidiaries of [ICH] by preparing, collating
> and mailing registration kits to registered representatives, and creates graphics and
> other art work for various marketing materials produced for these subsidiaries.  It
> also prepares the assembly, shipping and postage of literature pertaining to the
> subsidiaries.

(Id. ¶ 32).

The companies also have common ownership and management.  Mr. and Mrs. Charles

jointly own both IMS and ICC.  (Id. ¶ 28)  Mr. and Mrs. Charles are also the sole directors of

both companies.  (Id. ¶¶ 29, 31)  Mr. Charles is the President of IMS.  (Id. ¶ 29)  He is also the

President, CEO, and Chairman of ICH.  (Id. ¶ 30)  He is also the Chief Executive Officer of

ICC.  (Vaughn Aff., Ex. C at 42)  Mrs. Charles is the CFO, Treasurer and Secretary of IMS.  (Id.

¶ 29)  She is also the Secretary of ICC.  (Vaughn Aff., Ex. D)

The companies also share employees and services. For example:

- The bookkeeper of IMS processes commissions for ICC. (Complaint, ¶ 33) The bookkeeper, on information and belief, also provides Mr. Charles with a copy of IMS' financials. (Id.)

- The Vice President of IMS, Jennifer Lanouette, regularly attends meetings at ICC.[4] (Id. ¶ 36)

- Ms. Vaughn regularly worked for both ICC and IMS. (Id. ¶ 34) While working at IMS Ms. Vaughn had a signature stamp for Mr. Charles which she regularly used to affix Mr. Charles' name to contracts for various insurance companies on behalf of IMS and ICC. (Id. ¶ 35)

- IMS employees are regularly summoned to perform services at ICC's offices. (Id. ¶ 40) When IMS employees leave the Danvers office to work in Lynnfield, they are not required to clock out. (Id.)

- IMS marketers hold meetings and attend meetings at ICC. (Id.)

- IMS and ICC share an employee benefit plan. Since 2003, the employees of IMS have received health insurance through a plan with Blue Cross Blue Shield of Massachusetts that is in the name of ICC. (Id. ¶ 41)

- IMS has a 401K Profit Sharing Plan (the "Plan") in which Ms. Vaughn was a participant. (Id. ¶ 42) ICC employees also participate in this Plan. (Id.) Mr. and Ms. Charles are both trustees of the Plan. (Id.) Moreover, while the Plan is in IMS' name, the Summary Annual Report refers inquiries to IMS at the address and telephone number of ICC. (Id.)

Finally, Mr. Charles controls the activities and decisions of IMS, ICC and ICH. Mr. Charles regularly participates in and speaks at the monthly meetings of IMS employees. (Id. ¶ 39) Mr. Charles made the decision to terminate Ms. Vaughn. (Id. ¶ 38) He called Ms. Charles throughout the day and told her that if she did not fire Ms. Vaughn, he would do it himself. (Id.)

## II.    **Standard of Review**

IMS brought this Motion pursuant to both Fed.R.Civ.P. 12(b)(1), for lack of subject matter jurisdiction, and Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The application of

---

[4]    On information and belief, the Vice President of IMS and the head of the graphics design department at IMS received shares when ICH went public. (Id. ¶ 37)

each rule differs. "As to Rule 12(b)(6), the court's inquiry is narrow; it must simply decide

whether, from the allegations in the complaint, 'it appears beyond doubt that the plaintiff can

provide no set of facts in support of her claim which would entitle her to relief.' Under

Rule 12(b)(1), on the other hand, not only may the court consider materials outside the pleadings,

but it must answer a broader question: whether a plaintiff has borne her burden of proving the

existence of subject matter jurisdiction." Cousin v. Harold, 238 F. Supp. 2d 357, 359 (D. Mass.

2002) (internal citations omitted).

### III.    IMS' Motion Does Not Fall Within The Scope of Rule 12(b)(1)

"The question of [an employer's] status as an FMLA employer is appropriately resolved

in the context of either Rule 12(b)(6) or Rule 56, …[because] the … question … goes to the

merits of a plaintiff's claim, not the court's subject matter jurisdiction." Cousin, 238 F. Supp. 2d

at 361. In reaching this conclusion, this Court reasoned that

> considering the "employer" issue as jurisdictional would require the court, in the
> usual instance, to address factual matters prematurely, i.e., before discovery is
> complete. This is particularly problematic in FMLA cases because, … the
> 'integrated employer' test comprises a number of factual inquiries. If for no other
> reason, the court believes that the test should be applied in the context of
> Rule 12(b)(6) or a summary judgment motion, if not at trial.

Id. at 362.

The very same issue is before the Court here. Just as in Cousin, the issue of whether IMS

and the other corporate defendants are employers under the "integrated employer" test goes to the

merits of the claim and should be considered in the context of a Rule 12(b)(6) motion, not a

Rule 12(b)(1) motion.

IV.    **IMS, ICC and ICH are Integrated Employers Under the FMLA.**

      The FMLA requires a covered "employer" to provide an eligible employee[5] with a "serious health condition" up to twelve weeks of unpaid, job-protected leave. 29 U.S.C. § 2612(a)(1)(d). To be a covered "employer" it must "employ 50 or more employees for each working day during each of more than 20 or more calendar work weeks." Id. § 2611(4)(A)(i). It is undisputed that if IMS is an "integrated employer" with ICC and/or ICH, then it is an "employer" subject to the FMLA. IMS' Motion offers the simple, conclusory statement that it is not an integrated employer. If offers no evidentiary support for that conclusion. It highlights no allegation lacking from Ms. Vaughn's complaint that would preclude such a finding. Nor does it even cite to the only First Circuit case to have addressed this very issue. Thus, under either Rule 12(b)(1) or 12(b)(6), IMS' Motion must be denied.

      The FMLA implementing regulations set forth the test for an "integrated employer." The integration issue "is not determined by the application of a single criterion, but rather the entire relationship ... viewed in its totality." 29 C.F.R. § 825.104(c)(2). Factors to be considered include "(i) the commonality of management, (ii) the interrelation between operations, (iii) the centralized control of labor relations, and (iv) the degree of common ownership or financial control." Id. While the Court must consider all of the above factors, control of employment decisions is a primary consideration in evaluating employer status. Romano v. U-Haul Int'l, 233 F.3d 655, 666 (1st Cir. 2000) (applying integrated employer test to a Title VII claim). It is not, however, the exclusive factor. As the First Circuit explained,

        [T]he exclusive focus on individual hiring and firing decisions conflicts with the remedial public policy goal of antidiscrimination laws. In addition, a stringent emphasis on the labor prong renders the other three factors of the integrated enterprise test devoid of impact, essentially reducing the test to a one question inquiry. We choose to follow the more 'flexible' approach ... which focuses on

---

[5]    IMS does not contest that Ms. Vaughn is an "eligible employee."

6

> employment decisions, but only to the extent that the parent exerts 'an amount of
> participation [that] is sufficient and necessary to the total employment process,
> even absent total control or ultimate authority over hiring decisions.

<u>Romano</u>, 233 F.3d at 666. Here, however, Mr. Charles – the President of ICH and director of

ICC – made the decision to terminate Ms. Vaughn.

In the context of a Rule 12(b)(6) motion, a plaintiff's burden of alleging facts sufficient to

plead an integrated employer under the FMLA is very light. For example, this Court in <u>Cousins</u>

held that the plaintiff sufficiently pled an integrated employer relationship by alleging "that

Harold is the principal and owner of a business enterprise comprising three Domino's

franchises" and "is and has been an employer engaged in an industry affecting commerce with

50 or more employees." <u>Cousins</u>, 238 F.Supp.2d at 363; <u>see also</u> <u>Santos v. Knitgoods Workers'</u>

<u>Union</u>, 1999 WL 397500, at *3 (S.D.N.Y. June 15, 1999) ("whether [company] fits the

characteristics of ... an integrated employer poses a factual question which cannot be resolved

on a motion to dismiss"); <u>Bowman v. Ameren Corp.</u>, 2005 WL 1702802, at *7 (E.D.MO.

July 20, 2005) ("both [company x] and [company y] state that Ameren Corp. is their parent

corporation. Moreover, the correspondence plaintiff proffers suggest that employment decisions

may be made by one entity on behalf of another and by employees of the different companies.

On these facts, and without the benefit of further discovery, it cannot be said that no facts exist

suggesting defendants should be treated as integrated employers for the purpose of this action.").

As discussed in detail below, Ms. Vaughn has more than adequately pled facts to establish an

integrated employer relationship.

### A.    **Commonality of Management**

One element of the integrated employer test is the degree of commonality of management

between the entities. The management need not be identical to have this factor weigh in favor of

7

finding an integrated employer. See Romano, 233 F.3d at 667 (two companies sharing 3 directors supported finding of integrated employers); McConnell v. Swifty Transportation, Inc., 2005 WL 1865386, at * 5 (S.D. Ohio July 29, 2005) (two companies with virtually identical boards and officers supporting finding of integrated employer).

Here, Ms. Vaughn has sufficiently alleged facts demonstrating an overlap of management. Specifically, Mr. and Mrs. Charles are also the sole directors of both companies. (Id. ¶¶ 29, 31)  Mr. Charles is the President of IMS. (Id. ¶ 29)  He is also the President, CEO, and Chairman of ICH. (Id. ¶ 30)  Mrs. Charles is the CFO, Treasurer and Secretary of IMS. (Id. ¶ 29)  She is also the Secretary of ICC. (Vaughn Aff., Ex. D)

### B.     Interrelation Between Operations

The second factor, interrelation between operations of the company, considers the degree to which the companies share employees, services, and employee benefits. See e.g., Romano, 233 F.3d at 668 (finding that sharing of employees and cross-company sharing of marketing and accounting services sufficient to support finding of integrated employer); Watson v. CSA Ltd., 376 F. Supp. 2d 588, 595 (D. Md. 2005) (allegation that companies shared employee sufficient at motion to dismiss stage to state a claim of interrelation of operations necessary for integrated employer test); McConnell, 2005 WL 1865386, at *5 (sharing an administrative staff and management staff and combining shared benefit plans weighs in favor of finding an integrated employer).  Ms. Vaughn has pled such facts in her Complaint.  Notably, IMS failed to rebut any of the allegations in the Complaint with its own evidence.

IMS, ICC and ICH share services.  IMS provides "fulfillment functions" for ICH, including "preparing, collating, and mailing registration kits to registered representatives, and creates graphics and other art work for various marketing materials for these subsidiaries.  It also

prepares the assembly, shipping and postage of literature pertaining to the subsidiaries."
(Complaint, ¶ 32)  This statement is undisputed, as it must be, because it comes directly from
ICH's 2004 Annual Report filed with the Securities and Exchange Commission.  (Id.)  The
degree of interrelation is further exemplified by this simple fact: Ms. Vaughn had a signature
stamp for Mr. Charles that she was instructed to use on contracts on behalf of both IMS and ICC.
(Id. ¶ 35)

IMS, ICC and ICH each generate revenue for the other companies.  For example, ICC
sales account for 95% of the revenue of ICH.  (Id.)  Similarly, if an ICC agent sells a fixed
insurance product under IMS, IMS receives a percentage of the commission. (Id.)

IMS and ICC also share employees.  Many of the employees of IMS (including Ms.
Vaughn) provide services for ICC.  (Id. ¶ 34)  Other employees, like the Vice President of IMS,
regularly attend meetings at ICC.  (Id. ¶ 36)

IMS and ICC also share a benefits plan.  Since 2003, the employees of IMS have
received health insurance through Blue Cross Blue Shield that is in the name of ICC.  IMS and
ICC also share a 401K plan and the Summary Annual Report directs all inquiries to IMS at the
address and telephone number of ICC.  In addition, Mr. Charles is listed as the agent of for
service of process for the Plan.

Based on the allegations before the Court, under either Rule 12(B)(1) or Rule 12(B)(6),
Ms. Vaughn has sufficiently alleged evidence of interrelation of operations necessary to establish
an integrated employer.

**C.    Centralized Control of Labor Relations**

For this element, the First Circuit "focuses on employment decisions, but only to the
extent that the parent exerts 'an amount of participation [that] is sufficient and necessary to the

total employment process, even absent total control or ultimate authority over hiring decisions."
Romano, 233 F.3d at 666; see also Watson, 376 F. Supp. 2d at 597 (finding integrated employer
where plaintiff fired by employee of other company).

The decision to terminate Ms. Vaughn was made by Mr. Charles, the President of IMS
and ICH, and director of ICC. It was repeated to Ms. Vaughn that Mr. Charles repeatedly on the
day that she was terminated called Ms. Charles and told her that if she did not fire Ms. Vaughn,
he would. Just as in Watson, this allegation alone is sufficient to suggest that this factor weighs
in favor of an integrated employer relationship.

Even apart from the ultimate decision to terminate Ms. Vaughn, there were few
distinctions between IMS, ICC and ICH in terms of controlling the employees. For example,
Mr. Charles was intimately involved in the day to day operations of IMS and regularly spoke at
the monthly IMS staff meetings. Similarly, there was no separation between IMS and ICC when
it came to employees. When an IMS employee would provide work to ICC at ICC's offices in
Lynnfield, the employee was not required to clock out of IMS' payroll system.

Thus, these allegations are sufficient to defeat a Rule 12(b)(6) motion.

### D.    Degree of Common Ownership

Common ownership of the entities supports a finding of an integrated employer. See e.g.,
Romano, 233 F.3d at 667 ("U-Haul of Maine is owned in its entirety by U-Haul International");
McConnell, 2005 WL 1865386, at * 5 (common ownership prong weighs in favor of integrated
employer where "Myers is the sole owner and shareholder of Swifty Transportation. Meyers
also owns 74.5% of Swifty Oil's stock. Meyer's wife owns an additional 364 shares of Swifty
Oil stock.").

Here, IMS and ICC are both jointly owned by Mr. and Mrs. Charles. Mr. Charles is also the principal owner of ICH. (Complaint, ¶ 28) These allegations support a finding that ICC, IMS and ICH are integrated employers.

For the reasons stated above, Ms. Vaughn has sufficiently alleged facts necessary to meet the integrated employer test under the FMLA to defeat a Rule 12(b)(6) motion. Even if the Court were to construe IMS' Motion as a Rule 12(b)(1) motion, Ms. Vaughn has met her burden of proof that the Court has jurisdiction over this claim, particularly, where as here, her evidence unrebutted by IMS.

V.    Ms. Vaughn Provided Adequate Notice of Her Need For Medical Leave[6]

IMS also argues that even if it is an "eligible employer" under the FMLA, Ms. Vaughn has failed to allege all the elements of an FMLA claim. While IMS' argument is less than clear, IMS appears to argue that Ms. Vaughn did not provide IMS with the proper notice of her need for FMLA leave and did not provide medical certification of her need for leave. These arguments are both without merit.

Under the FMLA, the employee should provide the employer with 30 days notice for a foreseeable medical leave. 29 C.F.R. § 825.302(a). Here, Ms. Vaughn has alleged that she provided IMS notice of her upcoming surgery in Spring, 2005. (Complaint, ¶ 16). Ms. Vaughn informed IMS again of her need for medical leave in April 2005 and at that time provided IMS with a specific date in August for the surgery. (Id. ¶ 17) At a minimum, Ms. Vaughn provided

---

[6]    It is unclear from IMS' Motion whether it is moving to dismiss based upon an argument that Ms. Vaughn has not alleged a "serious health condition" as that term is defined by the FMLA. To the extent IMS is pursuing this argument, it is without merit. A "serious health condition" is defined as "an illness, injury, impairment or physical or mental condition that involves: (1) inpatient care (i.e., an overnight stay) in a hospital ... including any period of incapacity." 29 CFR § 852.114 [check quote] Here, Ms. Vaughn alleged that: (1) she needed a partial hysterectomy; (2) the procedure would require an overnight hospital stay; and (3) she would need six to eight weeks of recovery. (Complaint, ¶ 16) As such, she has sufficiently alleged this element of an FMLA claim.

11

IMS four (4) months of notice, a period of time even longer than IMS claims is required. (IMS Mot. at 10).

IMS' argument that Ms. Vaughn fails to state a claim because she failed to provide medical certification of her condition is also easily dismissed. Medical certification is not a requirement under the FMLA, it an option that the company can include in its FMLA procedure. IMS did not require this of Ms. Vaughn before it terminated her. As such, it cannot now claim this as a basis to dismiss her claim.

VI.     Conclusion

For the reasons stated above, the Court should deny IMS' Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(1).

Respectfully submitted,

ELIZABETH M. VAUGHN

By her attorneys,

Juliet Davison (BBO. No. 562289)
Tricia A. Rice (BBO No. 633556)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated: October 21, 2005

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the
above document was served upon the
attorney of record for each other party
by (mail)-hand on __10/21/05__

12

**EXHIBIT 1**

```
RECEIPT #_____
AMOUNT $___258_____
SUMMONS ISSUED__Y-8____
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK.___M_____
DATE_____7-21-05_____
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ELIZABETH M. VAUGHN,                          )
                                              )
                    Plaintiff,                )
                                              )
        v.                                    )        Civ. Action No. _____
                                              )
INVESTORS MARKETING SERVICES,                 )
INC., INVESTORS CAPITAL HOLDINGS,)
LTD., INVESTORS CAPITAL CORP.,                )
JANICE CHARLES AND THEODORE                   )
CHARLES,                                      )
                    Defendants.               )

# 05 11534 JLT

MAGISTRATE JUDGE _____

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.    Plaintiff, Elizabeth Vaughn ("Ms. Vaughn"), brings this action seeking damages

arising out of violations of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et. seq.*,

("FMLA") during her employment by Defendants Investor Marketing Services, Inc. ("IMS"),

Investors Capital Holdings, Ltd. ("ICH"), Investors Capital Corp. ("ICC"), Janice Charles ("Ms.

Charles") and Theodore Charles ("Mr. Charles").

### THE PARTIES

2.    Ms. Vaughn is an individual residing at 125 Farrwood Drive, Haverhill, MA

01835.

3.    IMS is a Massachusetts corporation registered to do business in Massachusetts.

IMS is located at 168 Centre Street, Danvers, Massachusetts 01923. IMS is an affiliate of

Investors Capital Corporation ("ICC"). IMS is in the business of providing fixed annuity, life

insurance and long term care products. IMS has over 7,000 licensed sales representatives that depend upon it for sales support and the latest available product information. IMS also performs the fulfillment functions for defendants ICC and ICH, including but not limited to licensing the registered representatives, preparing and mailing registrations kits and creating the graphics and other art work for ICC and ICH's marketing materials. It also prepares the assembly, shipping and postage of literature pertaining to ICH subsidiaries.

    4.    "ICH" is a Massachusetts corporation registered to do business in Massachusetts. ICH is located at 230 Broadway, Lynnfield Massachusetts 01940. ICH is a financial services holding company that operates primarily through its subsidiaries in two segments of the financial services industry: (i) securities, mutual funds, variable annuities and variable life insurance and (ii) financial planning services.

    5.    "ICC" is a Massachusetts corporation registered to do business in Massachusetts. ICC is located at 230 Broadway, Lynnfield Massachusetts 01940. ICC is a wholly owned subsidiary of ICH. ICC and ICH are located less than 75 miles away from IMS. ICC is the registered broker dealer in all 50 states for ICH. ICC makes available multiple investment products such as variable annuities and provides support, technology and back office services to its network of 800 independent registered representatives. ICC sales account for 95% of the revenue of ICH. If an ICC agent sells a fixed insurance product, IMS receives a percentage of the commission.

    6.    Ms. Charles is an individual residing at 65 E. Point Boulevard, Gloucester, Massachusetts.

    7.    Mr. Charles is an individual residing at 65 E. Point Boulevard, Gloucester, Massachusetts. Mr. Charles and Ms. Charles are husband and wife.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this case pursuant to 28 U.S.C. §1331 because Plaintiff's claims arise under a federal statute, the Family and Medical Leave Act 29 U.S.C. §2601 et seq. ("FMLA").

9.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

### Ms. Vaughn's Tenure at IMS

10.    Ms. Vaughn was born on October 20, 1949. She is currently 55 years old.

11.    Ms. Vaughn began her employment with IMS on or about July 5, 1995. As of approximately 1997, she worked as the Licensing Director. She reported directly to Jennifer Lanouette, a Vice President, who reported directly to Janice Charles.

12.    As the Licensing Director, her duties and responsibilities included but were not limited to ensuring that IMS and ICC were properly licensed in all states and making sure the contracts were fully executed. Her job required data entry, filing, problem solving and working with outside vendors, among other duties.

13.    Ms. Vaughn was an exempt, full-time employee, working at least 40 hours per week. She worked at least 1250 hours in the last 12 months prior to her requested medical leave. She did not take any unpaid leaves of absence during the last 12 months prior to her termination.

14.    Over the years, Ms. Vaughn met or exceeded the expectations of her supervisors. She conducted herself professionally at all times and always completed her abundant workload.

3

When she began work in 1995 she was compensated at the rate of $7.50 per hour. As of June 2005, she was paid $20.40 per hour.

15.    She never received a written warning and was never placed on a performance improvement plan.

### Ms. Vaughn's Request for FMLA Leave

16.    During the spring of this year, Ms. Vaughn informed her supervisor Jennifer Lanouette that she needed to have a partial hysterectomy. The surgery would require an inpatient procedure including an overnight hospital stay and six to eight weeks of recovery. During the recovery period, Ms. Vaughn will not be able to, among other things, lift items or drive. Ms. Vaughn requested a leave of absence for the surgery and the 6 to 8 week recovery period recommended by her doctor.

17.    In April, Ms. Vaughn confirmed her need for the surgery and notified Ms. Lanouette that the surgery would take place on August 9, 2005. Ms. Lanouette told her not to worry about her leave of absence.

18.    On June 6, 2005, Ms. Vaughn was terminated from her employment.

19.    The Defendants told Ms. Vaughn that her job would be "outsourced." Before her termination, no one suggested that there was not enough work for Ms. Vaughn to continue her position with the company.

20.    Ms. Vaughn's position has been "outsourced" to two, pre-existing younger employees who work for ICC. On information and belief, these two younger women will continue to work as ICC employees while performing the licensing duties for IMS.

21.    Ms. Vaughn was terminated to avoid providing her the FMLA leave.

4

22.    Ms. Lanouette has personally expressed her dismay over Ms. Vaughn's termination and offered to personally pay for Ms. Vaughn's COBRA expenses.

23.    Ms. Vaughn has suffered severe emotional distress because of her unlawful termination. She has been depressed, anxious, nervous and has suffered from insomnia.

**IMS Qualifies as an Employer under the FMLA**
**Because IMS, ICC and ICH are Integrated Employers**

24.    IMS, ICC and ICH are integrated employers under the FMLA and 29 CFR §825.104(c)(2).

25.    On information and belief, IMS has approximately 25 employees. ICH has at least 50 employees.

26.    ICC is a wholly owned subsidiary of ICH, a publicly traded company.

27.    IMS is an affiliate of ICC.

**Common Ownership**

28.    IMS and ICC are both jointly owned by Mr. and Ms. Charles. Mr. Charles is also the principal owner of ICH.

**Common Management**

29.    IMS, ICC, and ICH have common officers and directors. IMS' officers include Mr. Charles (President) and Ms. Charles (Treasurer, Chief Financial Officer and Secretary). Mr. and Ms. Charles have been the sole directors of IMS since 1995.

30.    ICH's President, CEO and Chairman of the Board is Mr. Charles and the Secretary is Ms. Charles.

31.    Mr. and Ms. Charles are the sole Directors of ICC. Mr. Murphy is its Treasurer.

## Interrelation Among Operations

32.     The interrelationship between IMS and ICH is best stated in the ICH 2004 Annual

Report, filed with the Securities and Exchange Commission:

> Investors Marketing Services, Inc. is jointly owned by [ICH]'s principal stockholder,
> Theodore E. Charles and his spouse, Janice M. Charles. This entity performs a
> fulfillment function for subsidiaries of [ICH] by preparing, collating and mailing
> registration kits to registered representatives, and creates graphics and other art work
> for various marketing materials produced for these subsidiaries. It also prepares the
> assembly, shipping and postage of literature pertaining to the subsidiaries.

(Id. at 33).

33.     In addition to the overlap in duties above, the bookkeeper of IMS processes

commissions for ICC. The bookkeeper, on information and belief, also provides Mr. Charles

with a copy of IMS's financials.

34.     Ms. Vaughn regularly did work for both ICC and IMS.

35.     While working at IMS Ms. Vaughn had a signature stamp for Mr. Charles which

she regularly used to affix Mr. Charles name to contracts for various insurance companies on

behalf of IMS and ICC.

36.     The Vice President of IMS, Jennifer Lanouette, regularly attends meetings at ICC.

37.     On information and belief, the Vice President of IMS and the head of the graphics

design department at IMS received shares when ICH went public.

## Centralized Labor Relations

38.     On information and belief, Mr. Charles controls all the activities and decisions of

IMS, ICC and ICH. Upon information and belief, Mr. Charles made the decision to terminate

Ms. Vaughn. On information and belief, he called Ms. Charles throughout the day and told her

that if she did not fire Ms. Vaughn, he would do it himself.

6

39.     Mr. Charles regularly participates in and speaks at the monthly meetings of IMS employees.

40.     IMS employees are regularly summoned to perform services at ICC's offices. IMS marketers hold meetings and attend meetings at ICC. When IMS employees leave the Danvers office to work in Lynnfield, they are not required to clock out.

### Shared Benefit Plans

41.     IMS and ICC share an employee benefit plan. Since 2003, the employees of IMS have received health insurance through a plan with Blue Cross Blue Shield of Massachusetts that is in the name of ICC.

42.     IMS has a 401K Profit Sharing Plan (the "Plan") in which Ms. Vaughn was a participant. ICC employees also participate in this Plan. Upon information and belief, ICC does not have a separate 401K plan for its employees. Mr. and Ms. Charles are both trustees of the Plan. Moreover, while the Plan is in IMS' name, the Summary Annual Report refers inquiries to IMS at the address and telephone number of ICC.

43.     Mr. Charles is further listed as an agent for service of legal process for the Plan.

### COUNTS

### COUNT I – FAMILY AND MEDICAL LEAVE ACT
(Against All Defendants)

44.     Ms. Vaughn repeats and incorporates by reference herein the allegations set forth in Paragraphs 1 through 43 above.

45.     IMS is an integrated employer with ICC and ICH under the FMLA. As such, they are bound by the FMLA.

46.     Ms. Vaughn was an employee eligible for FMLA leave.

47.     Ms. Vaughn had worked at least 1250 hours in the last twelve months.

7

48.    Ms. Vaughn requested medical leave for treatment of her own serious health condition. The partial hysterectomy would require an overnight stay at the hospital and a six to eight week period of incapacity for recovery.

49.    Ms. Vaughn had not used any of her 12 weeks of medical leave in the previous calendar year or any other 12 month period.

50.    Defendants failed and/or refused to grant Ms. Vaughn her FMLA leave.

51.    Defendants violated 29 U.S.C. §2601 et seq. by failing and/or refusing to grant Ms. Vaughn her medical leave and by terminating her employment. Thus, Ms. Vaughn is entitled to liquidated damages, back and front pay, medical expenses, double damages, equitable relief, costs and attorney's fees.

**COUNT II – RETALIATION UNDER THE FMLA**
(Against All Defendants)

52.    Ms. Vaughn repeats and incorporates by reference herein the allegations set forth in Paragraphs 1 through 51 above.

53.    On or about Spring 2005, Ms. Vaughn notified Defendants that she needed medical leave in order to have a partial hysterectomy.

54.    On or about April 2005, Ms. Vaughn told Defendants that her surgery had been scheduled for August 2005.

55.    Defendants terminated Ms. Vaughn's employment in June 2005. Defendants terminated her employment because she asserted her right to leave under the Family and Medical Leave Act. This is an act of retaliation.

56.    As a result of Defendants' violation, Ms. Vaughn has incurred damages including but not limited to loss of liquidated damages, compensation, medical expenses, double damages, attorneys' fees and costs, and emotional distress.

8

WHEREFORE, Ms. Vaughn respectfully requests that this Honorable Court enter judgment against the Defendants on Counts One and Two above, for the following:

  a.  Compensatory damages;

  b.  Liquidated damages;

  c.  Double damages;

  d.  Punitive damages;

  e.  Equitable relief;

  f.  Costs and interest;

  g.  Reasonable attorneys' fees; and

  h.  Any other relief that this Court deems just.

## JURY TRIAL DEMANDED

The Plaintiff hereby claims a trial by jury on all issues so triable.

Respectfully submitted,

ELIZABETH VAUGHN

By her attorneys,

Julie Davison (BBO No. 562289)
Tricia A. Rice (BBO No. 633556)
TODD & WELD LLP
28 State Street
Boston, MA 02109
(617) 720-2626

Dated: July 20, 2005

9

## Campbell, Claudia

**From:**    ECFnotice@mad.uscourts.gov
**Sent:**    Monday, July 25, 2005 2:09 PM
**To:**      CourtCopy@mad.uscourts.gov
**Subject:** Activity in Case 1:05-cv-11534-JLT Vaughn v. Investors Marketing Services, Inc. et al "Complaint"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Abaid, Kim entered on 7/25/2005 at 2:08 PM EDT and filed on 7/20/2005

**Case Name:**       Vaughn v. Investors Marketing Services, Inc. et al
**Case Number:**     1:05-cv-11534
**Filer:**           Elizabeth M. Vaughn
**Document Number:** 1

**Docket Text:**
COMPLAINT against all defendants Filing fee: $ 250, receipt number 65741, filed by Elizabeth M. Vaughn. (Attachments: # (1) Civil Cover Sheet)(Abaid, Kim)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=7/25/2005] [FileNumber=1063507-0
] [42c440873ae0d35d49a30926abaf34039f29676ab4bfe46c7ed16b0004ab1037fd3
6d432a89f659799088d8ec556e063e4e0f880865913b423a88ab09d78afb9]]
**Document description:**Civil Cover Sheet
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=7/25/2005] [FileNumber=1063507-1
] [a24958e857fdbc58d9ccb454aa7d608b17a2ada576230c8eb7d9d8592b34eda8335
4729736311eec63290ee9dc995aabb0707717d2f320b1babbb4ab9e9dd4a5]]

**1:05-cv-11534 Notice will be electronically mailed to:**

Juliet A. Davison    jdavison@toddweld.com, ccampbell@toddweld.com

Tricia A. Rice    trice@toddweld.com, jmlineman@toddweld.com

**1:05-cv-11534 Notice will not be electronically mailed to:**

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ELIZABETH M. VAUGHN,<br><br>       Plaintiff,<br><br>       v.<br><br>INVESTORS MARKETING SERVICES,<br>INC., INVESTORS CAPITAL HOLDINGS,<br>LTD., INVESTORS CAPITAL CORP.,<br>JANICE CHARLES AND THEODORE<br>CHARLES,<br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    Civ. Action No. 05-11534-JLT<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF ELIZABETH VAUGHN

I, Elizabeth Vaughn, hereby state and depose as follows:

1.      I am submitting this Affidavit in Opposition to Defendants Investors Marketing

Services, Inc. ("IMS") and Janice Charles' Motion to Dismiss the Complaint pursuant to

Fed.R.Civ.P. 12(b)(1).

2.      IMS is a Massachusetts corporation registered to do business in Massachusetts.

(IMS Annual Report of Domestic Corporation, attached as Exhibit A)  IMS is located at 168

Centre Street, Danvers, Massachusetts 01923.  IMS is an affiliate of Investors Capital

Corporation ("ICC").  IMS is in the business of providing fixed annuity, life insurance and long

term care products.  IMS has over 7,000 licensed sales representatives that depend upon it for

sales support and the latest available product information.  IMS also performs the fulfillment

functions for defendants ICC and ICH, including but not limited to licensing the registered

representatives, preparing and mailing registrations kits and creating the graphics and other art

work for ICC and ICH's marketing materials. It also prepares the assembly, shipping and postage of literature pertaining to ICH subsidiaries.

3.      "ICH" is a Massachusetts corporation registered to do business in Massachusetts. (ICH's Annual Report of Domestic Corporations, attached hereto as <u>Exhibit B</u>)  ICH is located at 230 Broadway, Lynnfield Massachusetts 01940.  ICH is a financial services holding company that operates primarily through its subsidiaries in two segments of the financial services industry: (i) securities, mutual funds, variable annuities and variable life insurance and (ii) financial planning services.  (ICH SEC Filing is attached hereto as <u>Exhibit C</u>)

4.      "ICC" is a Massachusetts corporation registered to do business in Massachusetts. (ICC Annual Report of Domestic Corporations, attached hereto as <u>Exhibit D</u>)  ICC is located at 230 Broadway, Lynnfield Massachusetts 01940.  ICC is a wholly owned subsidiary of ICH.  ICC and ICH are located less than 75 miles away from IMS.  ICC is the registered broker dealer in all 50 states for ICH.  ICC makes available multiple investment products such as variable annuities and provides support, technology and back office services to its network of 800 independent registered representatives.  ICC sales account for 95% of the revenue of ICH.  If an ICC agent sells a fixed insurance product under IMS, IMS receives a percentage of the commission.

5.      On information and belief, IMS has approximately 25 employees.  ICH has at least 50 employees.

6.      ICC is a wholly owned subsidiary of ICH, a publicly traded company.

7.      IMS is an affiliate of ICC.

### Common Ownership

8.      IMS and ICC are both jointly owned by Mr. and Ms. Charles.  Mr. Charles is also the principal owner of ICH.

## Common Management

9.      IMS, ICC, and ICH have common officers and directors.  IMS' officers include

Mr. Charles (President) and Ms. Charles (Treasurer, Chief Financial Officer and Secretary).  Mr.

and Ms. Charles have been the sole directors of IMS since 1995.

10.      ICH's President, CEO and Chairman of the Board is Mr. Charles.

11.      Mr. and Ms. Charles are the sole Directors of ICC.  Ms. Charles is the Secretary.

## Interrelation Among Operations

12.      The interrelationship between IMS and ICH is best stated in the ICH 2004 Annual

Report, filed with the Securities and Exchange Commission:

> Investors Marketing Services, Inc. is jointly owned by [ICH]'s principal
> stockholder, Theodore E. Charles and his spouse, Janice M. Charles.  This entity
> performs a fulfillment function for subsidiaries of [ICH] by preparing, collating
> and mailing registration kits to registered representatives, and creates graphics
> and other art work for various marketing materials produced for these
> subsidiaries.  It also prepares the assembly, shipping and postage of literature
> pertaining to the subsidiaries.

(Ex. C at 33).

13.      In addition to the overlap in duties above, the bookkeeper of IMS processes

commissions for ICC.  The bookkeeper, on information and belief, also provides Mr. Charles

with a copy of IMS's financials.

14.      I regularly did work for both ICC and IMS.

15.      While working at IMS I had a signature stamp for Mr. Charles which I regularly

used to affix Mr. Charles name to contracts for various insurance companies on behalf of IMS

and ICC.

16.      The Vice President of IMS, Jennifer Lanouette, regularly attends meetings at ICC.

17.    On information and belief, the Vice President of IMS and the head of the graphics design department at IMS received shares when ICH went public.

## Centralized Labor Relations

18.    On information and belief, Mr. Charles controls all the activities and decisions of IMS, ICC and ICH.  Upon information and belief, Mr. Charles made the decision to terminate me.  On information and belief, he called Ms. Charles throughout the day and told her that if she did not fire me, he would do it himself.

19.    Mr. Charles regularly participates in and speaks at the monthly meetings of IMS employees.

20.    IMS employees are regularly summoned to perform services at ICC's offices. IMS marketers hold meetings and attend meetings at ICC.  When IMS employees leave the Danvers office to work in Lynnfield, they are not required to clock out.

21.    When the "life department" moved from ICC to IMS, ICC continued to pay the wages of the IMS employees for a few months.

## Shared Benefit Plans

22.    IMS and ICC share an employee benefit plan.  Since 2003, the employees of IMS have received health insurance through a plan with Blue Cross Blue Shield of Massachusetts that is in the name of ICC.

23.    IMS has a 401K Profit Sharing Plan (the "Plan") in which I was a participant. ICC employees also participate in this Plan.  Upon information and belief, ICC does not have a separate 401K plan for its employees.  Mr. and Ms. Charles are both trustees of the Plan. Moreover, while the Plan is in IMS' name, the Summary Annual Report refers inquiries to IMS at the address and telephone number of ICC.

4

24.    Mr. Charles is further listed as an agent for service of legal process for the Plan.


Signed this _17_ day of October, 2005 under the pains and penalties of perjury.

                                    _Elizabeth Vaughn_
                                    Elizabeth Vaughn

# **EXHIBIT A**

**D F**

# The Commonwealth of Massachusetts
## William Francis Galvin
Secretary of the Commonwealth

One Ashburton Place, Boston, Massachusetts 02108-1512

**Annual Report for Domestic
and Foreign Corporations**

(General Laws Chapter 156D Section 16.22; 950 CMR 133.56)

Filing Fee: $125.00
Late Fee: $25.00

FORM MUST BE TYPED

FORM MUST BE TYPED

050080374

043044067

(1) The exact name of the corporation is  INVESTORS MARKETING SERVICES, INC.

(2) The corporation is organized under the laws of  MASSACHUSETTS

(3) The street address of the corporation's registered office in the commonwealth is
230 BROADWAY, LYNNFIELD, MA 01940
(number, street, city or town, state, zip code)

(4) The name of the registered agent at the registered office is  JANICE M. CHARLES

(5) The street address of the corporation's principal office is  230 BROADWAY, SUITE 201
LYNNFIELD                                    MA                         01940-2320
(number, street, city or town, state, zip code)

(6) Provide the name and business address of the corporation's board of directors and its president, treasurer and secretary, and if different, its chief executive officer and chief financial officer.

| | NAME | ADDRESS |
|---|---|---|
| President: | THEODORE CHARLES | 65 EASTERN PT. GLOUCESTER, MA |
| Treasurer: | JANICE CHARLES | 65 EASTERN PT. GLOUCESTER, MA |
| Secretary: | JANICE CHARLES | 65 EASTERN PT. GLOUCESTER, MA |
| Chief Executive Officer: | JANICE CHARLES | 65 EASTERN PT. GLOUCESTER, MA |
| Chief Financial Officer: | JANICE CHARLES | 65 EASTERN PT. GLOUCESTER, MA |
| Directors: | THEODORE CHARLES | 65 EASTERN PT. GLOUCESTER, MA |
| | JANICE CHARLES | 65 EASTERN PT. GLOUCESTER, MA |

(7) Briefly describe the business of the corporation:
INSURANCE

(8-9) The capital stock of each class and series

| CLASS OF STOCK | TOTAL AUTHORIZED BY ARTICLES OF ORGANIZATION OR AMENDMENTS Number of Shares | TOTAL ISSUED AND OUTSTANDING Number of Shares |
|---|---|---|
| COMMON: | 20,000. | 1,000. |
| PREFERRED | | |

(10) Check if the stock of the corporation is publicly traded. ☐

(11) Date of the fiscal year end is  MARCH  31  2005
(month, day, year)

Signed by _____
(signature of authorized individual)

(Please check appropriate box)

☐ Chairman of the Board of Directors     ☐ Incorporator     ☒ Other Officer     ☐ Court Appointed Fiduciary

on this  14th  day of  June  of  2005

457481
10-07-04

156d1622 9/23/04

09390526 809169 INV4067          2004.04020 INVESTORS MARKETING SERVICE INV40671

# EXHIBIT B



**The Commonwealth of Massachusetts**

William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

050076036

Filing Fee: $125.00
Late Fee: $25.00

FORM MUST BE TYPED

**Annual Report for Domestic
and Foreign Corporations**
(General Laws Chapter 156D, Section 16.22; 950 CMR 113.57)

043284631

(1) Exact name of the corporation: INVESTORS CAPITAL HOLDINGS, LTD.
(2) Jurisdiction of incorporation: MASSACHUSETTS
(3) Street address of the corporation's registered office in the commonwealth:
     230 BROADWAY, LYNNFIELD, MASSACHUSETTS, 01940
     *(number, street, city or town, state, zip code)*
(4) Name of the registered agent at the registered office: STEVEN C. PRESKENIS
(5) Street address of the corporation's principal office:
     230 BROADWAY, LYNNFIELD, MASSACHUSETTS, 01940
     *(number, street, city or town, state, zip code)*
(6) Provide the names and addresses of the corporation's board of directors and its president, treasurer, secretary, and if different, its chief executive officer and chief financial officer.

|  | NAME | ADDRESS |
|---|---|---|
| President: | SEE ATTACHED | |
| Treasurer: | SEE ATTACHED | |
| Secretary: | SEE ATTACHED | |
| Chief Executive Officer: | | |
| Chief Financial Officer: | | |
| Directors: | SEE ATTACHED | |
|  | SEE ATTACHED | |

(7) Briefly describe the business of the corporation: FINANCIAL SERVICES HOLDING COMPANY

(8-9) Capital stock of each class and series:

| CLASS OF STOCK | TOTAL AUTHORIZED BY ARTICLES OF ORGANIZA-TION OR AMENDMENTS Number of Shares | TOTAL ISSUED AND OUTSTANDING Number of Shares |
|---|---|---|
| COMMON | 10,000,000 | 5,757,198 |
| PREFERRED | | |

(10) Check if the stock of the corporation is publicly traded ☑

(11) Report is filed for fiscal year ending: MARCH / 31 / 2005
                                          *(month)*      *(day)*      *(year)*

Signed by: _____

☐ Chairman of the board of directors    ☑ President    ☐ Other officer    ☐ Court-appointed fiduciary

on this THIRD _____ day of MAY _____, 2005

c156d11672950c11357 01/13/05

Investors Capital Holdings, Ltd.
Board of Directors and Officers
May 1, 2005


Theodore E. Charles
President and Director
65 Eastern Point Blvd.
Gloucester, MA  01930


Timothy B. Murphy
Executive Vice President, Treasurer and Director
55 Chanticleer Road
Sudbury, MA  01776


David R. Smith
Director
600 Broad Street
Shrewsbury, NJ  07702


Steven C. Preskenis, Esq.
Assistant Secretary
73 Dover Road
Westwood, MA 02090


Arthur Stickney
Director
144 Granite St.
Rockport, MA  01966


William Atherton
Director
26370 Hickory Blvd., Apt. 603
Bonita Springs, FL  34134


C. Troy Shaver
Director
108 Traders Cross
Suite 105
Bluffton, SC 29910

**EXHIBIT C**

```
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>a4670794.txt
<DESCRIPTION>INVESTORS CAPITAL HOLDINGS 10-K
<TEXT>
```

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

-----------
FORM 10-K

|X|            ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE FISCAL YEAR ENDED
MARCH 31, 2004

COMMISSION FILE NO. 1-16349

-----------

INVESTORS CAPITAL HOLDINGS, LTD.
(Exact name of registrant in its charter)
------------

MASSACHUSETTS
(State or other jurisdiction of                      04-3284631
 incorporation or organization)        (IRS Employer Identification No.)

230 Broadway
Lynnfield, Massachusetts 01940
(781) 593-8565

(Address, including zip code, and telephone number, including area code,
of Registrant's principal executive offices)
----------

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

Title of each class        Name of each exchange on which registered
Common Stock, $0.01 par value        The American Stock Exchange

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
NONE
-----------

(Title of class)

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports) and (2) has been subject to such
filing requirements for the past 90 days. Yes |X| No |_|

Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to the

best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. |X|

     Indicate by check mark whether the registrant is an accelerated filer (as
defined in Rule 12b-2 of the Act). Yes|_| No |X|

     The aggregate market value of the shares of the registrant's common equity
held by non-affiliates, computed by reference to the price at which the common
equity was last sold, as of the last business day of the registrant's most
recently completed second fiscal quarter, was $6,839,470.

     As of June 15, 2004, there were 5,731,921 shares of Common Stock outstanding,
$0.01 par value per share of the registrant.

                         Documents Incorporated by Reference

     Certain portions of the registrant's definitive proxy statement for the
Annual Meeting of Stockholders to be held on August 10, 2004 are incorporated by
reference in Items 11 through 13 of Part III, and Item 15 of Part IV, of this
Annual Report on Form 10-K.

                            www.investorscapital.com

                   Investor Relations Contact: Darren Horwitz


                                      1

<PAGE>


<TABLE>
<CAPTION>
<S>        <C>
                                    Contents

Forward-Looking Statements..................................................................
PART I......................................................................................
ITEM 1. Business............................................................................
ITEM 2. Properties..........................................................................
ITEM 3. Legal Proceedings...................................................................
ITEM 4. Submission of Matters to a Vote of Security Holders.................................
PART II.....................................................................................
ITEM 5. Market for Registrant's Common Equity and Related Stockholder Matters...............
ITEM 6. Selected Financial Data.............................................................
ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of O
ITEM 7A.Quantitative and Qualitative Disclosures About Market Risk..........................
ITEM 8. Financial Statements and Supplementary Data.........................................
ITEM 9. Changes In and Disagreements With Accountants on Accounting and Financial Di
PART III....................................................................................
ITEM 10. Directors and Executive Officers of the Registrant.................................
ITEM 11. Executive Compensation.............................................................
ITEM 12. Security Ownership of Certain Beneficial Owners and Management and Related
ITEM 13. Certain Relationships and Related Transactions.....................................
ITEM 14. Controls and Procedures............................................................
ITEM 15. Principal Accountant Fees and Services.............................................
PART IV.....................................................................................
ITEM 16. Exhibits, Financial Statement Schedules, and Reports on Form 8-K...........
</TABLE>

2

<PAGE>

INVESTORS CAPITAL HOLDINGS, LTD.

Forward-Looking Statements

The statements, analyses, and other information contained herein relating to
trends in the operations and financial results of Investors Capital Holdings,
Ltd. (the "Company"), the markets for the Company's products, the future
development of the Company's business, and the contingencies and uncertainties
to which the Company may be subject, as well as other statements including words
such as "anticipate," "believe," "plan," "estimate," "expect," "intend," "will,"
"should," "may," and other similar expressions, are "forward-looking statements"
under the Private Securities Litigation Reform Act of 1995. Such statements are
made based upon management's current expectations and beliefs concerning future
events and their effects on the Company. The Company's actual results may differ
materially from the results anticipated in these forward-looking statements.

These forward-looking statements are subject to risks and uncertainties
including, but not limited to, the risks that (1) losses may be incurred if our
investment professionals fail to comply with regulatory requirements; (2) the
loss of either Theodore E. Charles or Timothy B. Murphy may adversely affect our
business and financial condition through the loss of significant business
contacts, which may be difficult to replace; (3) customer fraud could harm our
earnings and profits by requiring us to expend time, money and incur actual
loss, exposing us to the potential for arbitration; (4) investment professional
and employee fraud and misconduct could harm our profits and earnings by causing
us to expend time, money and incur actual loss, with the latter exposing us to
the potential for litigation; (5) without implementation of adequate internal
controls, and maintenance thereof, our ability to be profitable could be
severely restricted by regulatory sanctions being applied against our
broker-dealer subsidiary, and could result in us paying substantial fines and
limit our ability to be profitable; (6) involvement in material legal proceedings
could have a significant impact on our earnings and profits if we are found
liable for such claims; (7) a change in our clearing firm could result in the
inability of our customers to transact business in a timely manner due to delays
and errors in the transfer of their accounts, which, on a temporary basis, could
affect our earnings and profits.

Readers are also directed to other risks and uncertainties discussed, as well
as to further discussion of the risks described above, in other documents filed
by the Company with the United States Securities and Exchange Commission. The
Company specifically disclaims any obligation to update or revise any
forward-looking information, whether as a result of new information, future
developments, or otherwise.

3

<PAGE>

PART I

ITEM 1. Business

Overview

Incorporated in July of 1995, Investors Capital Holdings, Ltd. ("ICH") is a

financial services holding company that operates primarily through its
subsidiaries in two segments of the financial services industry. These two
segments provide for the offering of (1) services related to corporate equity
and debt securities, U.S. Government securities, municipal securities, mutual
funds, variable annuities, variable life insurance, market information, internet
online trading and portfolio tracking and records management and (2) financial
planning services, investment advisory and asset management services and the
management two retail mutual funds. Financial information pertaining to ("ICH")
for each of the three fiscal years ended March 31, 2004, 2003 and 2002 is
included in the selected financial data in Item 6 of this document.

Support to our Representatives

    Investors Capital Corporation. Investors Capital Corporation, ("ICC") a
National Association of Securities Dealers ("NASD") registered broker-dealer, is
also registered with the Securities and Exchange Commission ("SEC"), the
Municipal Securities Rule Making Board ("MSRMB") and the Securities Investor
Protection Corporation ("SIPC"). ICC is headquartered in Lynnfield,
Massachusetts and is a wholly-owned subsidiary of ICH. Conducting business in
all 50 states, the Commonwealth of Puerto Rico and the District of Columbia. ICC
makes available multiple investment products, and provides support, technology
and back-office service to its network of approximately 870 independent
registered representatives ("representatives"). Our representatives sell
investment products that are securities under federal and state law.
Accordingly, they are required to, and are registered as, representatives with
our broker-dealer subsidiary. Similar registrations may be required by these
persons as investment adviser representatives under federal and state law. Our
in-house training program for these representatives emphasizes the long-range
aspects of financial planning and investment products. We believe that through
the continuing education we provide to our registered representatives, our
clients can become better informed, and therefore, better served. ICC generated
approximately 95% of Investors Capital Holdings' total revenues for the fiscal
year ended March 31, 2004.

    We seek to recruit primarily experienced, productive registered
representatives by offering them an attractive commission payout and the
independence of owning and operating their own offices. Generally, each office
pays substantially, if not all, of the costs associated with its establishment
and operation. We provide technical, regulatory, supervisory, compliance and
other support services to our independent investment professionals. This allows
expansion of our operations with relatively minimal capital outlay. Continuing
to add experienced, productive registered representatives is an integral part of
our growth strategy.

    The commission payouts to our registered representatives are negotiable and
currently average approximately 82% of the gross dealer concession generated
from the sale of securities. Pursuant to the terms of our agreement with our
registered representatives, and as permitted by current NASD rules, we provide
our representatives, or their named beneficiaries, with continuing commissions
on pre-existing business in the event of their retirement from the securities
industry or death. Also, in this agreement, each of our representatives grants
to us the right to offset against commissions any losses we sustain as a result
of their actions, omissions and errors. Our agreement with our representatives
is terminable by either party with 15 days prior written notice, and does not
contain either a confidentiality or non-compete provision.

    Our products and services provided to our representatives include:

     Technology Resources: Utilizing the latest in technology, our
representatives are able to perform the following activities on-line:

```
Opening of new accounts,
Monitoring of existing accounts,
Updating of client accounts,
Trading,
Viewing and downloading commission data,
Locating and exploring approved products,
Downloading client data;
and Researching reports or inquiries on companies, securities and other
pertinent financial topics.
```

4

<PAGE>

Product Choices: Allowing our representatives to choose from a wide
variety of investment products sponsored by well-respected and financially
sound companies is critical to our registered representatives' success as
well as that of the Company. We follow a selective process in determining
approved products to be offered to clients by our representatives. In
addition, we continuously monitor the product list.

Marketing: Producing compliance and NASD-approved marketing materials to
be used by our representatives enhances their professional stature in the
public's eye. The marketing resources produced by Investors Capital
Corporation include:

Corporate and product brochures;
Technology resources;
Client and corporate websites;
Client letters;
Seminars; and
Advertising and public relations.

Focus: Our focus is on representatives who offer their clients assistance in
attaining their long-range financial goals. Utilizing primarily experienced
representatives, our client list is widely diversified in terms of goals,
financial resources and geography. During the fiscal year ended March 31, 2004,
the average revenue per registered representative was $54,936 as compared to
$35,557 for our fiscal year ended March 31, 2003. Additionally, on March 31,
2004, we had a total of 870 representatives in our national network, as compared
to 958 for the same period last year.

Supervision: Our broker-dealer subsidiary's compliance staff includes
individuals with significant industry experience. Six of these individuals,
including two experienced compliance attorneys, are located in the home office.
The remaining compliance individuals, most of whom have significant industry
experience, termed Offices of Supervisory Jurisdiction by the NASD, are field
supervisors situated across the country and are charged with compliance
responsibilities for a defined group of registered representatives. By
positioning these compliance individuals in the field, we are able to more
closely scrutinize and monitor the activities of our representatives thereby
ensuring, as much as possible, their compliance with the requisite rules and
regulations. Such a field supervisor is assigned to each new registered
representative affiliated with our broker-dealer subsidiary. Our in-house
computer systems and programs further assist us in compliance matters. In
addition, our Compliance area routinely conducts internal audits of our
Anti-Money Laundering Program to ensure our compliance with all current
regulations under the USA Patriot Act issued October 21,2001.

Our representatives seek and value assistance in the area of compliance, and in keeping step with the latest industry regulations, our compliance department provides, among other things:

Advertising and sales literature review; Field inspections, followed up with written findings and recommendations; Weekly faxes and monthly conference calls on selected compliance topics; Assistance with customer complaints and regulatory inquiries; Workshops and in-house publications on various compliance matters; and Regional and national meetings.

Clearing: We utilize the services of another broker-dealer to clear our transactions. Our clearing agreement is on a fee-for-service basis. Our clearing firm processes most of the securities transactions for our account and the accounts of our clients. Services of our clearing firm include billing and credit extension, and control, receipt, custody and delivery of securities. The Company pays a transaction charge for these services, relying on the operational capacity and the ability of our clearing firm for the orderly processing of security transactions. In addition, by engaging the processing services of a clearing firm, certain capital reserve requirements and other complex regulatory requirements imposed by federal and state securities laws are not applicable.

Broker-Dealer Revenue: Revenue generated from the activities of our broker-dealer subsidiaries is broken into the following percentages for fiscal years ended March 31:
<TABLE>
<CAPTION>
<S>


Commissions from the sale of mutual funds and unit investment trusts:
Commissions from the sale of variable annuities and variable life insurance:
Commissions from the sale of individual stocks and bonds:
Commissions from the sale of direct participation programs:
Other miscellaneous commission and fee income:
</TABLE>

5

<PAGE>

Investment Advisory Services

Eastern Point Advisors, Inc., (EPA) our investment adviser subsidiary, provides investment advisory and asset management services directly to the investing public through its managed asset programs. These programs involve managed portfolios of load and no-load mutual funds, variable and fixed annuities and/or individual securities. They are provided to the public through approximately 338 investment adviser representatives. As of March 31, 2004, we had a total of $136.6 million under management. The maximum annual fee charged for these services is 3.0%, which is paid by the customer in quarterly installments. Eastern Point Advisors contributes approximately 5.2% of Investors Capital Holdings' total revenues. The following table describes assets under management specifically related to accounts managed by EPA.

| Eastern Point Advisors, Inc. | Market Value |
| ---------------------------- | ------------ |

```
American Skandia Annuity Company                    $ 21,827,151
ING Variable Annuity                                   8,793,648
Jackson National Life Insurance Co.                    3,424,376
Jefferson National Life                                9,662,111
Lincoln Benefit Life Insurance Co.                       956,001
Manulife                                                 215,892
Mass Mutual Life Insurance Co.                         1,478,951
Midland National                                         446,066
Nationwide Life Insurance Co.                          1,088,182
Pershing Securities Managed Asset Plan                15,108,585
Resources Trust                                        1,232,708
SEI Trust Company                                      4,961,547
US Allianz Annuity Company                             1,551,813
                                                    ------------
Assets Under Management:                            $ 70,747,031
                                                    ============
```

Investors Capital Corporation,(ICC) in November 2003, became a registered investment advisor, Investors Capital Advisor,(ICA). (ICA) retained assets from Eastern Point Advisors, (EPA) in March of 2004. These assets under management totaled $65,938,586 and are invested in the Pershing Securities Managed Asset Plan Platform.

In addition, our investment adviser subsidiary is the investment adviser to our retail mutual funds, the Eastern Point Advisors Twenty Fund and the Eastern Point Advisors Rising Dividend Growth Fund. Until recently, these mutual funds were marketed to the public solely by registered representatives of Investors Capital Corporation. Recently, EPA has begun making its portfolios available to other broker-dealers. We have entered into selling agreements making our managed asset programs available to registered representatives of certain other broker-dealers, as well as to allow our mutual funds to be marketed by investment professionals affiliated with certain selected broker-dealers in addition to Investors Capital Corporation. These wholesaling activities increase the exposure of both the managed asset programs and the mutual funds.

As of March 31, 2004, Eastern Point Advisors had approximately $8.5 million under management in the Twenty Fund and $1.4 million under management in the Rising Dividend Fund. The annual fee for services charged by Eastern Point Advisors to the Twenty Fund is 1.50% and .75% to the Rising Dividend Fund. These fees are paid monthly.

As of March 31, 2004 we had approximately 338 investment adviser representatives registered with the various state securities departments. These investment adviser representatives are typically registered representatives of our wholly-owned brokerage subsidiary. Licensing requirements for these investment adviser representatives are dictated by the state in which they conduct business. As such, prior to their clients utilizing our investment advisory services, each investment adviser representative must satisfy the requisite state licensing requirements which are typically the NASD Series 6 or 7 securities license coupled with a Series 65 or 66 license.

Asset Allocation Strategy: Eastern Point Advisor's asset allocation strategy, and Investors Capital Advisor,(ICA) utilized by approximately 2,171 investors as of March 31, 2004, is based on the principle that, by investing in a combination of asset classes, risk may be reduced while seeking to provide enhanced returns. Thus, by combining asset classes that typically do not move in tandem, the volatility of the customer's investment portfolio may be lowered while, at the same time, providing the opportunity for possible increased long-term returns. In implementing this asset allocation strategy for each individual customer, the Company utilizes the following three steps:

6

<PAGE>

    With the use of detailed questionnaires completed during personal
    interviews, we determine a customer's ascertained tolerance for risk,
    investment goals, age, time horizon, investment experience, and financial
    and personal circumstances. Based upon these facts, we will recommend an
    overall investment allocation consisting of a suggested percentage of
    stocks, bonds and cash.

    Should the customer agree with the recommended overall investment
    allocation, we will then select what we believe to be the appropriate
    investment vehicles for the particular customer from a universe of mutual
    funds, variable annuities and individual securities.

    Following implementation of the recommended portfolio, our investment
    adviser subsidiary monitors the performance of the portfolio, communicates
    the model's performance to the client quarterly basis minimally and makes
    any necessary changes based upon performance, changes in a customer's
    financial situation, goals or risk tolerance or any other factor relevant
    to the composition of the customer's portfolio.

    Fee-Based Compensation Structure: As required by the Investment Advisers Act
of 1940, compensation is based on an annual fee calculated as a percentage of
total assets under management rather than a transaction-based commission or
performance fee.

Insurance Operations

    ICC Insurance Agency, Inc., our wholly-owned insurance agency subsidiary,
facilitates the sale of variable life insurance and variable annuities by our
registered representatives. In certain states, a separately licensed insurance
entity is required in order to transact variable life and annuity business. This
entity is properly licensed in all states in which such licensing is required.
One hundred percent of all funds realized by this entity flow through as revenue
to our broker-dealer subsidiary.

Mutual Funds

    The Eastern Point Advisors Twenty Fund: The Eastern Point Advisors Twenty
Fund, formally known as the Investors Capital Twenty Fund, is our
growth-oriented mutual fund, which became available for sale on October 19,
1999. We created this mutual fund to compliment our existing product lines with
the rationale that our mutual fund would provide investors with a convenient way
to meet their financial goals and, at the same time, provide new sales
opportunities for representatives of our broker-dealer subsidiary.

    The Eastern Point Advisors Twenty Fund invests in a portfolio of common
stocks believed to offer capital appreciation potential. As such, the Fund may
be more suitable for those investors who seek capital appreciation and are
willing to accept a significant degree of volatility and risk. The Eastern Point
Advisors Twenty Fund utilizes a non-diversified portfolio of 20 to 30 common
stocks of companies of any size, regardless of industry or sector, which may
include smaller emerging companies. As of March 31, 2004, the Eastern Point
Advisors Twenty Fund had assets of $8,544,212.

    Class A Shares of the Eastern Point Advisors Twenty Fund carry a maximum
one-time, up-front sales charge to the investor of 5.75%. This sales charge
decreases as the dollar amount of the investor's investment increases. Class C

insured by the SIPC.

32

<PAGE>

NOTE 8 - TRANSACTIONS WITH RELATED PARTIES
-------------------------------------------

    ICH has arrangements with several related parties for a variety of
transactions. These transactions are incurred in the normal course of business
and are fully arms-length in the nature of their business relationship.

    The Company was paid management fees of $1,315,306 and $894,242 for the years
ended March 31, 2004 and 2003 respectively, from ICC and EPA. Management fees
are allocated from ICH to ICC based on a 70% allocation of direct operating
expenses and at a 30% allocation to EPA. At March 31, 2004, the Company was owed
$423,268 and $17,156, respectively from ICC and EPA. At March 31, 2003, the
Company was owed $260,061 and $60,660, respectively from ICC and EPA.

    The Company leases office space from the Arlsburg Trust, the trustee of whom
is the principal stockholder of the Company and Investors Realty, LLC, the
principal member of whom is the principal stockholder of the Company. Rent
expense for these leases amounted to $192,423, $175,799 and $175,799, for the
years ending March 31, 2004, 2003 and 2002, respectively.

33

<PAGE>

                    INVESTORS CAPITAL HOLDINGS, LTD. AND SUBSIDIARIES
                    ---------------------------------------------------
                      NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
                      -------------------------------------------
                                      (Continued)
                                      -----------
                      Years Ended March 31, 2004, 2003 and 2002
                      -------------------------------------------

NOTE 8 - TRANSACTIONS WITH RELATED PARTIES (Continued)
-------------------------------------------------------

    Two of the members of the Board of Directors are also registered
representatives and received compensation related to commissions or consulting
fees in the years ending March 31, 2004, 2003 and 2002 of $176,652, $186,418 and
$66,828 respectively.

    Loans Receivable From Registered Representatives - These loans consist of
promissory notes, which bear interest at the rate of 3.94% per annum, and are
payable within 18 or 24 months of the date of the note, in weekly installments.
The notes are secured by various pledges of brokerage accounts and/or personal
assets of the registered representatives. As of March 31, 2003 these loans
amounted to $95,389. $18,141 of these loans was to a registered representative
who is also a Director of the Company. As of March 31, 2004 these loans were
$69,306.

The Company is owed money from senior executives. As of March 31, 2004 and 2003
the balances owed amounted to $64,400 and $104,088, respectively.

    Investors Marketing Services, Inc. is jointly owned by the Company's

principal stockholder, Theodore E. Charles and his spouse, Janice M. Charles. This entity performs a fulfillment function for subsidiaries of the Company by preparing, collating and mailing registration kits to registered representatives, and creates graphics and other art work for various marketing materials produced for these subsidiaries. It also prepares the assembly, shipping and postage of literature pertaining to the subsidiaries. For the years ended March 31, 2004, 2003 and 2002, the cost paid for these services was $60,038, $60,130, and $62,982, respectively.

Included in accounts receivable at March 31, 2004 is $60,969 and $200,226 at March 31, 2003 due to EPA from the Eastern Point Advisors Twenty Fund (the "Twenty Fund"). As compensation for its services EPA receives on a monthly basis an investment advisory fee calculated at the annual rate of 1.5% of the Twenty Fund's average daily net assets. EPA has voluntarily agreed to waive its advisory fees or reimburse other Twenty Fund expenses so that the Twenty Fund's annual operating expenses will not exceed 5.00% for Class A shares and 5.75% for Class C shares, of the average daily net assets of the respective class. The waiver may be terminated by EPA at any time. EPA has three years to recoup any expenses it pays for on behalf of the Twenty Fund, or the receivable relating to that year will be written off by EPA. A summary of outstanding amounts for waived fees since the inception of the Twenty Fund, and the related fund year are as follows as of March 31, 2004:

| 2004 Amount | 2003 Amount | Reimbursable Fund Year End | Ex |
|---|---|---|---|
| $    -- | $ 54,929 | 2000 | Sept |
| -- | 13,090 | 2001 | Sept |
| 60,969 | 73,893 | 2002 | Sept |
| -- | 58,314 | 2003 | Sept |
| $60,969 | $200,226 | | |

Management of the Company believes, based upon a reduction in future estimated administrative costs associated with a change in the Fund's administrator under a service agreement effective May 1, 2002, that the entire receivable from the Fund as of March 31, 2004 will be recovered by EPA. The amount outstanding for the 2002 Reimbursable Fund Year end of $60,969 consists of waived advisory fees for which management believes is recoverable.

A new mutual fund was started on March 5, 2004, The Eastern Point Advisors Rising Dividend Growth Fund (the "Dividend Fund"). The total start-up costs incurred by the Company were $91,752. As of March 31, 2004, there was no receivable balance due from the Dividend Fund in the form of waived management fees or reimbursable out of pocket costs.

34

<PAGE>

INVESTORS CAPITAL HOLDINGS, LTD. AND SUBSIDIARIES
----------------------------------------------------
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
--------------------------------------------

| ------------------------ | ----------------------- | ----------------------- | ---------- |
| ------------------------ | ----------------------- | ----------------------- | ---------- |
| Net Income (Loss) | 169,799 | 23,967 | 120 |
| ------------------------ | ----------------------- | ----------------------- | ---------- |
| ------------------------ | ----------------------- | ----------------------- | ---------- |
| Basic & Dilute Earnings (Loss) per Share | .03 | .00 | .0 |
| ------------------------ | ----------------------- | ----------------------- | ---------- |

</TABLE>


NOTE 20 - SUBSEQUENT EVENTS
----------------------------

    Subsequent to year end, in the normal course of business there was a
trading error initiated by a Registered Representative that occurred on April
20, 2004. The potential impact is estimated to be approximately $530,000
increase to the cost of Commission and Advisory fee in ICC's income statement.
The Company is currently pursuing all remedies, including insurance and recovery
from the Registered Representative. In management's opinion, the outcome of such
remedies, however, can not be reasonably estimated at this time.


ITEM 9. Changes in and Disagreements with Accountants on Accounting and
        Financial Disclosure.

        None.

                                   42

<PAGE>


                                 PART III

ITEM 10. Directors and Executive Officers of the Registrant.

    The following table presents information about each of our executive officers
and directors. All directors hold office until the next annual meeting of
stockholders or until successors have been duly elected and qualified. There are
no arrangements or understandings between any director and any other person
pursuant to which he or she was selected as a director.

<TABLE>
<CAPTION>

| NAME | AGE | POSITION(S) HELD |
|------|-----|------------------|
| <S> | | <C> |
| Theodore E. Charles.............. | 61 | President, Chairman of the Board, Chief E Director |
| Timothy B. Murphy................ | 39 | Executive Vice President, Treasurer, Chie Director |
| Janice M. Charles................ | 53 | Secretary |
| David R. Smith................... | 42 | Director |
| Stephen Parker................... | 69 | Director |
| James F. Twaddell................ | 65 | Director |
| C. Troy Shaver, Jr............... | 57 | Director |

</TABLE>

    THEODORE E. CHARLES, founder of Holdings in July of 1995, serves as
chairman of the board, chief executive officer and president. Mr. Charles also

serves as the chief executive officer of Investors Capital Corporation and
Eastern Point Advisors. In addition, he is the founder and co-owner of two other
unconsolidated companies: Investors Marketing Services, Inc. in June of 1989 and
Eastern Point Distributors, LLC, in April of 1999.

Mr. Charles received his Bachelors degree from Ithaca College, Ithaca, New
York in May of 1964. He also has graduate hours from the University of Hartford,
Hartford, Connecticut and St. Lawrence University, Canton, New York. Mr. Charles
was previously a life insurance agent with National Life of Vermont. He
currently holds various securities licenses, including the series 6, 63, 7 and
24. Mr. Charles is a member of the Financial Planning Association and has been
since 1985. He was formerly Chairman of the Shareholder Advisory Board of Life
USA Insurance Company and is a former member of the Board of Trustees of the
Museum Council, Museum of Fine Arts in Boston. Mr. Charles is married to Janice
M. Charles.

TIMOTHY B. MURPHY is also a July 1995 founder of Holdings and currently
serves as treasurer, chief financial officer and a director. Since August of
1994, Mr. Murphy has also served as president of Investors Capital Corporation.
In addition, since January of 1995 Mr. Murphy has been president of Eastern
Point Advisors. He entered the securities industry in May of 1991 as an
operations manager, assisting brokers in the Boston regional office of Clayton
Securities. >From February through August of 1994, he was a compliance officer
of Baybanks Brokerage in Burlington, Massachusetts and a vice president of G.R.
Stuart & Company, a brokerage firm located in Maynard, Massachusetts. Mr. Murphy
earned a Bachelor of Science degree in Finance from Babson College, Wellesley,
Massachusetts in May 1986. He holds various securities licenses, including the
series 4, 7, 24, 27, 53, 63 and 65. Mr. Murphy is a member of the New England
Securities Compliance Group and past member of the National Society of
Compliance Professionals.

DAVID R. SMITH is a founding partner and Managing Director of Charter
Financial Publishing Network in Shrewsbury, New Jersey. Founded in March 2000,
CFPN publishes, markets and distributes information for the financial services
industry. He is co-founder of, and currently oversees sales, marketing and
circulation for FINANCIAL ADVISOR magazine, along with other newsletters, books
and investment charts distributed by CFPN. He was previously Senior Vice
President of Dow Jones Financial Publishing Corporation, where he served as
Publisher of DOW JONES INVESTMENT ADVISOR and Associate Publisher of DOW JONES
ASSET MANAGEMENT magazines since October of 1987. Mr. Smith attended Hobart
College in Geneva, New York from August of 1982 through January of 1983 and
graduated from Monmouth College in West Long Branch, New Jersey in June of 1985.

STEPHEN PARKER was formerly a vice president of Allmerica Financial, a
Fortune 500 financial services firm located in Worcester, Massachusetts. He was
also president of Allmerica Investment Management Company (AIMCO), the
Registered Investment Advisory Company (RIA). Prior to joining Allmerica
Investments, Mr. Parker was chairman and chief executive officer of Freedom
Capital Management, a subsidiary of John Hancock, with $2.7 billion under
management including 12 mutual funds. Mr. Parker has held positions of president
and CEO of Interact Management, Inc., an affiliate of the Colonial Group; and
Moseley Securities, a regional brokerage firm. Mr. Parker has been a director of
the Securities Industry Association (SIA), has served on many committees, and
has all series of Securities Registrations. He is a graduate of Harvard
University, with a B.A. in Economics.

43

<PAGE>

JAMES F. TWADDELL was a member of the corporate finance team of Schneider

# **EXHIBIT D**

# D F

## The Commonwealth of Massachusetts

Filing Fee: $125.00
Late Fee: $25.00

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

050071160

FORM MUST BE TYPED

## Annual Report for Domestic and Foreign Corporations
### (General Laws Chapter 156D, Section 16.22; 950 CMR 113.57)

043161577

(1) Exact name of the corporation: INVESTORS CAPITAL CORPORATION

(2) Jurisdiction of incorporation: MASSACHUSETTS

(3) Street address of the corporation's registered office in the commonwealth:
230 BROADWAY, LYNNFIELD, MASSACHUSETTS, 01940
*(number, street, city or town, state, zip code)*

(4) Name of the registered agent at the registered office: STEVEN C. PRESKENIS

(5) Street address of the corporation's principal office:
230 BROADWAY, LYNNFIELD, MASSACHUSETTS, 01940
*(number, street, city or town, state, zip code)*

(6) Provide the names and addresses of the corporation's board of directors and its president, treasurer, secretary, and if different, its chief executive officer and chief financial officer.

| | NAME | ADDRESS |
|---|---|---|
| President: | TIMOTHY B. MURPHY | 230 BROADWAY, LYNNFIELD, MA 01940 |
| Treasurer: | JANICE M. CHARLES | 65 EASTERN POINT BLVD., GLOUCESTER, MA 01930 |
| Secretary: | JANICE M. CHARLES | 65 EASTERN POINT BLVD., GLOUCESTER, MA 01930 |
| Chief Executive Officer: | | |
| Chief Financial Officer: | | |
| Directors: | THEODORE E. CHARLES | 65 EASTERN POINT BLVD., GLOUCESTER, MA 01930 |
| | JANICE M. CHARLES | 65 EASTERN POINT BLVD., GLOUCESTER, MA 01930 |

(7) Briefly describe the business of the corporation:
INVESTMENT BROKER DEALER

(8-9) Capital stock of each class and series:

| CLASS OF STOCK | TOTAL AUTHORIZED BY ARTICLES OF ORGANIZA-TION OR AMENDMENTS Number of Shares | TOTAL ISSUED AND OUTSTANDING Number of Shares |
|---|---|---|
| COMMON | 150,000 | 1,000 |
| PREFERRED | | |

(10) Check if the stock of the corporation is publicly traded ☐

(11) Report is filed for fiscal year ending MARCH / 31 / 2005
*(month)*        *(day)*        *(year)*

Signed by: _____

☐ Chairman of the board of directors    ☑ President    ☐ Other officer    ☐ Court-appointed fiduciary

on this THIRD _____ day of MAY _____ , 2005

c156ds16722950ct1157 01/1305